Saint Paul-Mercury Indemnity Company, Appellant, vs. State Department of Agriculture and another, Respondents.

*March 6—April 3, 1951.*

For the appellant there was a brief by *Aberg, Bell, Blake & Conrad* and *Carroll Metzner,* all of Madison, and oral argument by *Mr. Metzner.*

For the respondent State Department of Agriculture there was a brief by the *Attorney General* and *Roy G. Tulane,* assistant attorney general, attorneys, and *Anthony E. Madler,* counsel for the department, of counsel, and oral argument by *Mr. Tulane.*

For the respondent Charles Stesniak there was a brief by *Doar & Knowles* of New Richmond, and oral argument by *Warren P. Knowles.*

MARTIN, J. This case involves a claim under sec. 100.06, Stats., by Charles Stesniak against the Saint Paul-Mercury Indemnity Company as surety on its bond guaranteeing payment to farmers for milk delivered to the Midway Cheese Factory, located in Barron county, Wisconsin.

Mr. Stesniak had received from the Midway Cheese Factory, for milk delivered in September and October of 1947, two checks: One for $513.28, dated October 25, 1947 (Exhibit 4), and one for $440.75, dated November 10, 1947 (Exhibit 5).

The question of liability on Exhibit 5, the check for $440.75, is not before this court because the petitioner has not appealed from the determination of the department and the trial court that the indorsement of the payee thereon was a forgery.

The first check (Exhibit 4) was indorsed in the name of Charles Stesniak by Mrs. Stesniak. It had been presented to the bank and was twice dishonored because of insufficient funds. Thereafter Stesniak lost both checks. At the time Exhibit 4 was lost and when Lippert, the secretary-treasurer and general manager of the Midway Cheese Company, obtained it, it bore not only the Stesniak indorsement but also the indorsement of the collecting banks. Stapled to the front of the check was a slip of the drawee bank marked "Not

Sufficient Funds," and another slip with the following printed matter:

"The attached check has been dishonored twice, and because of the many indorsements it becomes impractical for us to handle it in the regular way.

"Please do not deposit this check again.

"If a new check cannot be obtained, or settlement effected otherwise, our collection department will be glad to handle the item for collection and credit your account, if and when the check is paid.

"First Wisconsin National Bank of Milwaukee."

The evidence that the checks were lost is uncontroverted, but there is confusion in the testimony of the witnesses as to the exact date. The department in its findings stated that the checks were lost by Stesniak on November 25, 1947.

Lippert, the treasurer of the drawer of the checks, claimed that he offered to pay the amount thereof to Stesniak at his farm on the afternoon of December 4, 1947. Mr. Stesniak testified:

"Q. Just tell us what took place at that time. A. He asked me, 'Have you got the checks?' He said, 'Give me the checks and I will pay you cash,' and *I did not know that he had the checks already then.* I did not tell him that they was lost, and I told him I filed them with the finance company already. He said, 'That's all right, you will get paid for them anyway.'

"Q. You told him that you had filed the claim with the bonding company? A. Yes.

"Q. And he said you would be paid? A. Yes."

The evidence is clear that Lippert knew that one Attorney Van Sickle represented Stesniak for the purpose of taking steps to collect from the bonding company.

Lippert claimed that he paid the money to a stranger who called at the Midway Cheese Factory about eight o'clock the

night of December 4th. He had never seen the man before and he has not seen him since. He testified:

"*Q*. Did you ask this man who presented the checks who he was? *A*. Yes, he introduced himself. I don't remember the name.

"*Q*. Did he have anything to show that he had authority? *A*. No, nothing at all. Nothing except these checks.

"*Q*. He presented nothing at all to show that he had authority from Mr. Van Sickle or Mr. Stesniak to present the checks? *A*. That's right.

"*Q*. You presumed that the checks were evidence of his authority to make collection thereon? *A*. That's right.

"*Q*. He was a total stranger to you? *A*. That's right, yes, sir.

"*Q*. You hadn't seen him before or since? *A*. That's right.

"*Q*. Was anything said which would lead you to believe that he was a representative of Mr. Van Sickle? *A*. Nothing except what I was going to do about the checks. Some remark whether I can take care of them now. Something of that nature."

The next day Lippert sent a certified check for $261.58 to Stesniak in payment for milk delivered during a period subsequent to that covered by the two checks. He sent a letter but did not mention anything about having paid the checks in cash.

The Department of Agriculture made the following finding of fact on May 12, 1949:

"That no part of the sum of $954.03 due to Mr. Stesniak for milk delivered by him to the Midway Cheese Factory has been paid to him nor to any person authorized by him to receive payment."

Appellant contends that when a negotiable instrument is indorsed in blank by the payee thereof, and presented by a holder to the maker for payment, the payment by the maker to the holder of that instrument constitutes a valid discharge

of the instrument and of the obligation for which it was issued.

Sec. 117.37 (1), Stats., provides:

"A negotiable instrument is discharged:
"(1) By the payment in due course by or on behalf of the principal debtor."

The meaning of "due course" as used therein is defined as follows in sec. 117.06, Stats.:

"Payment is made in due course when it is made at or after the maturity of the instrument to the holder thereof *in good faith* and *without notice that his title is defective.*" (Italics ours.)

Exhibit 4, the $513.28 check in question here, is not an ordinary negotiable instrument. The front of the check was largely covered with stapled memoranda from the banks which attempted to clear the check. These clearly indicated that the check was no good. On the back of the check there was indorsement upon indorsement, including a canceled indorsement. The blank indorsement upon which appellant relies was placed on the check prior to all these additions and notations. The check bore all the evidences of dishonor and the fact of dishonor was also personally known to Lippert previous thereto. Lippert had been advised that the checks were in the process of collection from the bonding company. In spite of all this, he claims he paid the checks.

Under all the circumstances existing in this case, we cannot conclude that Lippert made payment in good faith. He had sufficient notice of a defect in the holder's title. However, he made no pretense of requiring the possessor of the checks to identify himself and establish his title to the instruments or his right to receive payment as agent. This was strange behavior for a man who was secretary and treasurer and principal stockholder of a corporation, and a man who on

the following day paid several milk producers by certified check.

*By the Court.*—Judgment affirmed.